All right. Well, of course, now we can proceed because we have a judge count in full effect. So, now, before you begin, you were going to tell me how much time you wanted for rebuttal. Three minutes, Your Honor. All right. Very well. Go ahead, sir. Before talking about what this case is about, I just want to take a moment to talk about what it's not about. Not at issue in this litigation is whether or not the event moratorium that was issued in July 2020 was unconstitutional. You'll concede that the void for vagueness is waived, I presume? Yes. OK. The under well-established Supreme Court precedent in the Hurley case, parades are akin to protest marches or demonstrations. They have the same amount of cases supporting both. They're both First Amendment protected activity. The city has said that it was a misstep. The district court said, described the acts as unconstitutional acts. So that's not the question. What we have here is sort of a narrow procedural question about the voluntary cessation doctrine and how it applies in unique circumstances of this case. The district court erred in talking about the mootness determination in several regards. First, there's an issue of it appears that she is misunderstanding. Before you get there, I'm sorry for interrupting, but let me just pick up on the theme about what the case is not about. Because this case is not a 1291 appeal of a final decision. This is a 1292B, I think, appeal of the denial of a P.I. Yes. And so in order to show that the district judge erred in denying that P.I., don't you have to show that there was, we run those Riley factors, those pretty well-known four factors, likelihood of success on the merits and irreparable harm. And so I guess what I'm thinking is I got a 28J, we got a 28J letter from the city. And in my head I started to think to myself, regardless of how that solves mootness, how does that solve irreparable harm? Because if PVV is going to hold its parade next month, what's irreparable harm? And if there's no irreparable harm, then really where are we in terms of don't, I guess maybe we affirm without the, because there's no irreparable harm. And maybe we say, hey, look, it wasn't on mootness grounds, if we disagree with mootness, but there's no irreparable harm. So where are we on irreparable harm? Because you aren't here on a final, on a 1291, you're here on a denial of a P.I. And so don't you have to show, in order to show that that P.I. was wrongfully denied irreparable harm? Am I missing something? I think the irreparable harm was when the decision was made in December of 2012. It's so funny. You were here for the first case where we're talking about the snapshot rule, right? We're back to that, right? But are we looking at the irreparable harm then? Or are we looking at the irreparable harm now? Because my understanding of TROs especially is that they can last for like 14 days, but then they have to be re-evaluated. So whereas standing is evaluated at the time of filing, it's less obvious to me that you look at such things as P.I.s, at the time that they were moved for or requested, but rather you look for them at the time that a court is re-evaluating them. Otherwise, there would be no requirement to re-evaluate a TRO after 14 days to reassess to see if everything was good. If it was at the time of the complaint or at the time of the original filing, it would be static. Standing might be static, but irreparable injury doesn't strike me as static. So in order to prevail, don't you have to say, listen, you probably have to win mootness. You have to win those other things. But then you still have to come forth and say, and as of right now today, the reason the district court erred is because I have an irreparable harm. I think that in order to prevail today, we have to establish standing. We have to establish that although the controversy was mooted, that there's an exception to the mootness doctrine under the voluntary succession doctrine. And if we were to say that- You're saying that that exception affects our ruling on standing? No. They're two separate- If you fail, I mean, you will agree with the proposition that if you're deemed to have failed on standing, that's the end of the inquiry, yeah? Correct, yes. So on standing, I think that we've met our- Let's talk about standing. I don't want to feel inspired, but I think standing comes before the- Yeah, I will circle back to that, and if I don't, I'm sure Your Honor will remind me, but- I don't want to- No, I'm sorry. I beg your pardon. Finish answering the PI question, and then we'll go to standing. I'm sorry. The point of the voluntary succession doctrine is to avoid situations where a defendant doesn't change its behavior, unconstitutional, unlawful behavior, until it's confronted with a lawsuit. Were this to apply- Well, actually, you know, in terms of irreparable harm, we don't know where COVID's going. In fact, today, there are more of the trailing seven-day averages of positive COVID tests- Let me just make it really acute. If you were to go to district court today to file a PI, do you think you could make the irreparable harm showing today? I do not. Okay. If we evaluate irreparable harm as of today, and you don't have irreparable harm today, then it sounds like the district court's denial of the PI, we can't reverse, because we can't unring the bell for the intervening months that happened, because it's equitable relief going forward, prospective relief, and we can't give that now. I think what the court can do- But that's been affirmed, right? Well, I think what the court would say is, the district court, or what I hope the court would say is, the district court got it wrong. This isn't a case where mootness applies because of the voluntary succession doctrine. So let's say we say that, and then we'd say, okay, now we have to evaluate the PI motion. District court got it right, because there's no current- at least not in a way that we can reverse, because you can't show irreparable harm today. What are we supposed to do? Reverse and say there should be a PI? Vacate and say reconsider the PI when you know that there's no irreparable harm that's currently going on? Right now? You can move again for a PI later if you have standing and if you have mootness, but today you don't need one. I think from a procedural standpoint, if this court were to make a ruling that says that, that says, look, the voluntary succession doctrine applies. This case needs to be remanded back to the district court for further proceedings, but we're affirming the denial of the preliminary injunction on other grounds that maybe weren't apparent to the district court at that point in time in that snapshot, but now X number of months later, it looks like the same threat of irreparable harm isn't as acute. But the whole point of this inquiry is, as we go forward, at least from the PI standpoint, right, what's the irreparable harm? And if you can't articulate irreparable harm today, we're going to get the standing. If you can't articulate irreparable harm today, isn't that the end of the inquiry? There would be nothing to remand. It would just be an affirm. I think it would go back to the court to remand and to consider our declaratory judgment. I mean, I don't think we need to formally issue. It's a 1292B. It's interlocutory. The district court, the proceedings are still ongoing. It just might be stayed. So we don't need to formally remand it. We just end an interlocutory appeal. Then you're back in district court to, I guess, litigate whatever's left of the case, if anything. We're in the back of the standing now, aren't we? Yeah. Yeah. Or a mootness. So maybe I know you wanted to go back to the standing. So maybe to consider that even if the preliminary injunction isn't granted or even if it goes back to the district court, they don't say proceedings and we proceed on the complaint, not the motion for the preliminary injunction, I think it's important because the city has moved to dismiss the complaint on the basis of the judges, the district court's December ruling. So I think the controversy that would be before the court, the district court, if this court reverses the mootness determination would be, is PVB entitled to the declaratory relief that it sought initially in the complaint, that the event moratorium was unconstitutional. I think that's important because, one, it's one of the field factors in the Third Circuit, whether or not a plaintiff asked for declaratory relief in addition to other forms of relief, including injunctive relief. I mean, it's interesting, Matt, this might be for another court another time, but declaratory relief still requires sufficient, I believe the test is, immediacy in reality. And so, you know, you can't just get a declaratory judgment just because you want one. You have to show standing and then you have to show something that rides on top of standing. And the buzzword seems to be sufficient immediacy in reality, which is kind of a fun phrase, but you still have to show that. Well, standing was evaluated on October 30, 2020. That is a snapshot, right? That's standing. You either have standing or you don't. And then after that, if the controversy resolves itself, then it's a mootness issue. I don't think there's any issue of standing, although the judge seemed to think that there was. The judge made that determination on two grounds. The district court said, one, this was an unofficial policy statement and it's not subject to judicial review. That's just incorrect based on the authority cited in here. Anyone with this final decision-making authority can issue a written, unwritten, official, unofficial policy statement. Here it was announced at the mayor's official press conference. It appeared on official city websites. It appeared on Mayor Kenney's Facebook page. There's no question that this was. We have all these orders, right? We have the September supplemental order. We have the November order. I don't think there's an October order. The question is, as we look at these orders, they're all affecting the possibilities of action on your client's part in different ways. Talk to me about standing. The parade demonstration distinction, I mean, right, distinction went away, right? I mean, for these purposes, they're essentially the same, yeah? It did not go away until the November 23rd order. That was the first order where they rescinded the July event moratorium explicitly. The first order, the September order, raised the cap on participants from 50 to 150 people. So prior to that, if you had 49 people, you could have a parade, I guess, presumably, and you wouldn't get shut down. But if you had more than 50, you would potentially have the threat of being shut down. Well, how should we look at the September 20th letter, right? It says the city was not granting permits for any protests, parades, demonstrations, et cetera, and it buys the bottom line as the members can gather on public space. Then you have the supplemental order, which seems to be more broad in what the city is not going to do. And then the November order, which seems like everything's off the table. So with that progression, how does that affect standing? It doesn't affect standing except that the September order has an impact on standing. Standing is assessed at the moment that PVV filed its lawsuit in October. And at that point, what the city's official position was that the moratorium order was still on official city websites. It was still in effect. It was still integrated into the most recent executive orders. And the only thing that had changed between July and September was that they increased from 50 to 150 people. It was still if you want to march down the street and have a parade of 151 people, you were not permitted to do so under the then existing executive orders. Is there anywhere in the record where we either know or can intuit that there was to be a parade or demonstration that exceeds 150 people? There were a lot of parades and other events that were to exceed that. And I believe that the managing director of the city at the time that this was announced in July called up all the relevant parade organizers, the Veterans Day Parade, the Mars New Year's Day Parade, I'm sorry, the Civil Lucky Marathon, for example, and advised them all that their events were being canceled under this new order. So just to tease out standing, standing does require an injury in fact that has to be concrete and particularized. And so would you agree that if PVV had actually applied for a permit, its injury would be more concrete? It didn't apply, but had it applied, and this is the kind of thing only lawyers would advise you to do, right? The city says don't apply. We aren't doing it. The lawyer says do it anyway. But if you would have done that, it would make your injury, your client's injury, more concrete, right? Two responses to that. One is that the challenge is not just a mass supply challenge, but also a facial challenge. So it doesn't change the fact that if PVV would have applied, that doesn't change that the statute on its face was unconstitutional. And then secondly, as a practical matter, there was no way to apply for a permit because the permit office was closed. It was not accepting, receiving. There was not even an option to go on the website. So you're basically saying, look, we're as concrete as we could be at that point in time. Correct. Okay. Let me ask you about the September supplemental. Was there any explicit statement by the city that your group could not gather? Yes, there was. There was a statement by Mayor Kenyon the July 14th that said that parades, festivals, everything else. No, no, no. Put the July statement aside, right? You have the September letter and then you have the September supplemental order. Correct. And then when those were issued, was there anything that – any explicit statement by the city that your group could not gather? Yes, in the order it said that – again, I've raised the cap from 50 to 150. It said for events over – and I'm paraphrasing – events over 150 people, permits are required. The unsaid thing is you can't get a permit because the permanent office is closed and we're not issuing them. And that permits are being enforced. There was a de-escalation clause in that order that said we're going to avoid forcibly shutting down events. But there was also a clause in that order that says if you violate this, you're exposing yourselves to civil penalties and fines. So as of the date of that order and continuing, and that was the only relevant order at the time PVV filed this lawsuit, the city's position was clear. If you wanted to have 151 people walk down the street and march in a parade, you could not do so without the risk of, one, actually being shut down. They said they would avoid shutting down, but that is not the same as saying we're not going to shut you down. You're allowed to do this. And then, two, you are still exposing yourselves to civil fines and penalties, which for a group is significant. Even if they don't get shut down, if they get a fine in the mail a few weeks later saying we know that you did this and you're being fined for it, that's enough to chill the speech. So it's – and you persist in the theory that this is content-based. It is content-based because the order that existed on – that was initially promulgated by the city on July 14th made a distinction between parades and demonstrations. That distinction persisted on city websites until November 23rd when they finally decided to rescind the order. If you went on to the city's permitting website on July – I'm sorry, on November 22nd, 2020, you would see the screen capture that we provide in our order. More than that to show content-based, right? Like a city can have a rule that says no more than X decibels is permitted. Parades or demonstrations or anything more than X decibels is not permitted, right? That's not on its base content-based. Now, if you realize that everyone who wants to do some sort of demonstration or First Amendment activity wants to go loud, right, and then you can say, aha, now with my coupling of the fact that this group likes to go loud coupled with their rule, maybe I can begin to engineer a content-based allegation even for something that's spatially content-neutral. That's kind of hard because at least for facial challenge, you're looking at something that is spatially content-neutral. And so I don't know that you can say distinction between parades and demonstrations is on its own content-based. You need some reference to extrinsic events. And really, if we're going to look at extrinsic events, then maybe anything that's content-neutral can sooner or later be content-based because I'm going to look at extrinsic events and say, oh, this content-neutral applied to me becomes content-based. What do you say? You need something else. That's my question, right? Yeah. That's not the order that we have here. The order that we have here distinguishes between two equally protected First Amendment types of speech, parades and demonstrations. If there was something that they tried to do an end around. But it's not based on the content of the speech. It's based on the mode of expression. It's like volume, right? Like above this decibel. Who cares what's said above this decibel, right? It's just above this decibel isn't allowed. That's content-neutral regulation. Why isn't the distinction between parades and demonstrations also content-neutral? Because we aren't saying parades that advocate this or parades that celebrate this get this treatment. Others based on their content get this treatment. The distinction between these modes of First Amendment expression strikes me as most naturally fit in the content-neutral space. That doesn't mean a lot of First Amendment scrutiny still doesn't apply. But it's not what it is if it's content-based. What do you think? So obviously the order distinguishes between parades and demonstrations. The city thought that there was a distinction between those two or else it wouldn't have done that. It wouldn't have said parades on one hand, demonstrations are permitted. I understand what... I understand there's a distinction between the two. I'm just saying why is it a content-based distinction, not a content-neutral distinction? That's my question. The Supreme Court says there isn't a distinction between them. The Supreme Court in Hurley says that looking at a line of protest march and demonstration cases, parades are no different than that. It's the active movement of a group of people to make a collective point. That's the same with parades. It's the same with demonstrations. It's the same with protest marches. If it's content-neutral, how does that help you? It should be content-neutral. I'm sorry. Because they are the same and they're both equally protected under the First Amendment and under Hurley, then the city had no basis of saying you're not allowed to parade, but you can demonstrate. This is really where the First Amendment's Equal Protection Clause is kind of hard and stuff like this, because it's not really a content-based requirement. It seems like a content-neutral requirement which requires different justifications, much like if the volume of sound was too loud, the city could say this is why we want the volume of sound only to be at this decibel and they'd have to justify it based on that ground. The city would have to justify the distinction that it has between parades and demonstrations. It's not a free pass in the constitutional space, but it's probably a reduced level of scrutiny. The Supreme Court says that there isn't a way to distinguish between parades and demonstrations. They're the same. They're entitled to the same treatment. That's where the city did their unconstitutional act. They tried to discriminate between parades and demonstrations, knowing that there's a difference between a Veterans Day parade on the one hand and a politically-motivated demonstration on the other. But the September Supplemental and the November orders address that, right? And those are content-neutral. The November order addresses that when it says we welcome all sorts of speech, whether they be parades, whatever else, demonstrations, festivals, what have you. That's in the supplemental in September, right? Whereas the city welcomes all forms of First Amendment expression during these turbulent times. And then they have a whereas on the 15th of 150 people. And then it goes on to say that if you have more than 150 people and you don't have a permit and permits are required, then we can take action against you. But that's content-neutral, isn't it? It's not. If you're looking at just that piece, you might reach that conclusion. But that's not why we're here. It's not just based on that. That wasn't the only order that the city put out. But at one level, aren't you trying to prove too much? Doesn't your case win if you just sit there and say or at least have some likelihood of success on the merits if you say, I have a content-neutral-based restriction. I keep going back to volume because that's the Supreme Court's S-A-I-A, where it's volume-based. The city still has to justify that content-neutral-based distinction. And so from what I believe, you think that you have to prove content-based distinction in order to prevail. But some content-neutral distinctions can be unconstitutional as well, right? That is correct. But what we're responding to is what the city is arguing. The city argued in the district court that there was a content-neutral basis for discriminating between the two speeches. They did not argue that the event moratorium was content-neutral on its face. But by September, it's content-neutral on its face. And by September, because of COVID, they're not issuing any permits. Right, but they also issued an order that appears on the city's website and the mayor's official Facebook page and was part of an official press release that says parades are canceled. That's unequivocal. That's what they say. However, this does not apply to demonstrations. This event moratorium does not apply to demonstrations. Let me ask you a question. You keep harping back to July, and there are obviously at least three subsequent issuances that we're looking at, right? September letter, September supplemental, and then November, right? Are we to keep at the four July throughout our analysis? Or at some point, does the fact that there are things subsequent to July that are content-neutral supposed to carry the day on standing at all? So to answer your first question, yes, you are supposed to consider stuff outside, and that's the message that the city was continuing to promulgate on its website, saying that that distinction between parades and demonstrations continued until November 23rd. That was on their website until November 23rd. So despite what they say in the September order, and look, in the September order, they could have said, look, we made a mistake. We should not be discriminating between parades and demonstrations. They're both protective First Amendment speech. Let's make that clear. They did not make that clear until November 23rd on the eve of filing their opposition brief in order to manufacture the mootness argument. But don't the September 2 issues erase the content-based distinction? And essentially, doesn't that trump whatever you were looking at, whatever one would look at on the website? I mean, the website's issued by whomever, but these were official correspondence, which you say, policy or no, they should carry the day. They hopefully would carry the day if we got shut down and we had to get involved in litigation trying to defend ourselves. We hopefully would be able to say, look, based on this September 15th order, we think that we were entitled to. The court, I'm sorry, the city could just as easily say, no, no, no. As of September 15th, as of that order, it was clear what we were doing. We required permits and you did not get a permit. Well, go to the permit website. What does the permit website say? Permits are not being issued at this time. Parades, you cannot get a permit. Demonstrations, you're excluded from this. You can demonstrate without the need for a permit. So that's where the issue. But isn't it what Judge Greenlee's getting at, that whereas maybe originally there was a complete kind of distinction between parades and demonstrations. Then over time it begins to come together. And then in September, as I understand September, it said, listen, if you're under 150 people, there's no distinction. But if you're over 150 people, then we still need a permit. Correct. And so what you're saying is, hey, that continued need for a permit, coupled with what's on the website, coupled with, I assume, you've got an allegation somewhere that says we were going to have over 150 people. Then you say, okay, now September brought them together for under 150 people, but they remain distinct even after the September executive order for gatherings of over 150 people. And you say that's exactly what's in play by my client. That's why we have standing as of September. Is that right? I think that's exactly right. I think if you're sitting in September, again, snapshot, if I'm sitting in September advising a client what to do, you read that order and you say, okay, clear, over 150 people, we need a permit. We cannot do this without a permit unless we want to risk the possibility of being shut down or civil penalties in addition to that. Let's go to the city's website and see how to get a permit. Oh, it's closed. You cannot get a permit. If you're having a demonstration, you don't need a permit, according to the city's website. But if you want to have a parade, you need to have a permit, and we're closed, we're not issuing any. So the September order closed the gap between the two for under 150 people, potentially. But since there are over 150 people, you say they didn't close the gap in a way that is applied to us mattered. Yeah, I don't even think it closed the gap for under 50 people. I think that in the original order didn't apply to under 50 people to start with. Under 150 people, under 150. Yeah, I'm sorry. In the original moratorium order, it said public gatherings of more than 50 people require a permit, we're not issuing permits. It expanded that from 50 to 150 in September, but everything else remained the same. It still remained that you still needed a permit if you wanted to exceed that number, whether it was 50 or 150, and it still remained that you couldn't get a permit because they weren't issuing them, and it still remained that you were accepted from the permitting requirement if you were having a demonstration as opposed to a parade. I'm sorry. I guess it's somewhere. I just have forgotten where it is. Where do you say that you're going to be more than 150 people? If it's not in the complaint, I think it is in the complaint, in that we say the various things that we are involved in, and one of the things that we say we're involved in is the Veterans Day parade, which was canceled as a part of this because it was over. I mean, to Judge Greenway's point, I mean, when you filed the complaint, there was no order requiring over 150 people, so it would have a particular level of foresight to include an allegation in the complaint that says our parade has over 150 people when the regulation limiting people to 150 people didn't come out yet. I mean, that would be pretty impressive. In addition to that, I'm not sure. You didn't include that allegation in the complaint. Right. But in addition to that, there is a facial challenge. We talk about all the events that were canceled. Those obviously include events that have more than 150 people, and that's the reason that they were canceled. I'm so sorry. I'm going to interrupt you because you said three minutes ago you have in your complaint that you said somewhere it was 150 people. I have the complaint in front of me. I don't see it. That doesn't mean it's not there. But where else might it be? Because it's a big record. I'm one person, but I don't remember seeing it. Yeah, I'm sorry. I don't off the top of my head recall where it would have been, but I think it's implicit in the fact that the Veterans Day Parade has – It can't possibly be implicit, right? How can that be implicit? I don't know what PVV is. I'm sure it's a very big organization. I've never heard of it before this case, but, you know. Well, the Veterans Day Parade has more than 150 people. You basically asked us on appeal for the first time to take judicial notice that historically the Veterans Day Parade had more than 150 people and that in 2020 the plan was for it to have over 150 people, but that's not in the record? Well, I think if it was raised by the city as a reason, we would have included it in the record. It would have been a part of the record. That was never raised. But that's the whole point, right? I mean, the whole point of this part of the discussion is the 2 September correspondences, communications, and the November changed the landscape, if you will, right? And there would have been no way to anticipate that change of the landscape. So the arguments that you might have with regard to the July communication really fall by the wayside once the September communications come in, which is why we're spending time on this, you know, notion of content neutral. So let's assume, because it could be in there and we can't find it, but let's assume for a moment that it doesn't, that you don't allege more than 150 people somewhere. How does that take away from your argument? Because it would seem even more so that the 2 September communications that talk about under 150 and more than 150 clearly and also meld any distinction between parade and demonstration would lead you at that point to say it's got to be content neutral. So a couple things in response to that. First is I think in the complaint, and again, it's been a while since we were in there and drafting that complaint, but I think what it says is that we want to engage in First Amendment protected activities that we cannot engage in because of the event moratorium. Whether that's 50 or 150 people, what have you, if there's a requirement that we have to say the specific number of people who would be in that event, you know, we might not say that, but we do say that this is something that is affecting our rights. We want to engage in First Amendment protected activity that we cannot engage in because of the event moratorium. Secondly, it's not just a mass supply challenge, it's a facial challenge. So I think that regardless of whether or not we want to have 49 people or 51 people or 151 people, I think it doesn't deprive us of standing. I think there's still a live controversy because of the unconstitutional application of this distinction to other groups, not just PVV. And, Your Honor, I'm not sure. I think there was a more direct question there that I may not have responded to yet. It would just be nice if somewhere in the complaint which was filed after the September executive order, if it said, oh, by the way, we're here and we want to have over 150 people, therefore this distinction that's being drawn actually may appear to be content neutral, but there's not a justification for it that includes us, and you've got pictures in the complaint of demonstrations that have 50,000 to 60,000 people in them, which is, I guess, that proves the volume of those, but you don't have anything about the complaints, the phrase you would like. I think what we say is that you do have. I'm going to interrupt you because you don't have it in front of you. You should, but you don't. Paragraph 64, page 19A-048, I think this is as close as you get. You say, second supplemental order increases the capacity limitations from 50 to 150, but this new limitation is still insufficient for most parades. It doesn't speak to what you're going to have, but that's about as close as I can see you coming. I think, Your Honor, So the presiding judge knows the record. Everyone knows the presiding judge knows the record. It's generic. I'm not confident that it helps particularly, but that's there and I want to be fair. And I think what I was alluding to earlier is allegations such as paragraph 74 of the complaint where it says, although PDE might otherwise apply for permits to hold public events consistent with its mission or participate in events organized by other advocacy groups not before this court, it has been discouraged from doing so because defendants have explicitly stated that such applications will not be accepted, reviewed, processed, or approved. They were not accepting, reviewing, processing, or approving applications for events of 150 more people. I admit that we don't say 150 in there. I'm sorry? But you accept that that's content neutral, yeah? I accept that the number is content neutral. I accept that. I think where the content discrimination comes into play is you can have public gatherings of under 150 people, regardless of what you are. You can be a parade. You can be a festival. You can be a demonstration. You can be a street fair. If you want to have an event of over 150 people, you need a permit. You cannot get a permit because we're not issuing them for parades. You don't need one for a demonstration, but you do need one for a parade, and we're not issuing them. So that's where this allegation comes in. That's just an attack on a content neutral regulation that is being applied in a way that does not justify the content neutral basis of the regulations. 150 people, whatever justification you have for it becomes harder and harder and harder to continue to justify if demonstrations of 50,000 people are permitted. You don't have to get into an analysis of what the content of a demonstration is versus what the content of a parade is. You could just say, look, it's really, really hard to justify a content neutral distinction at the 150 person point when you're permitting, allowing, when you're allowing demonstrations or any gathering. It could be a parade of 50,000 people. Just because you need to have some justification still, government still needs some justification for even content neutral restrictions. And we made arguments that they're similar to that at the district court level, and what I'm responding to now and what we responded to in our appellate briefs are the arguments that the city raised, which this is not one of them, and the arguments that the district court relied on in dismissing the lawsuit as moot, which was not based on this 150 versus 50 or content neutral. What that was based on was, hey, this is an unofficial policy. It doesn't have the force of law, so it's not reviewable. And also, even if it was reviewable, they explicitly rescinded it prior to you filing the lawsuit, which isn't true, unless we've talked about it a lot. If you were over 150 people, you still needed a permit, and you still couldn't get one if you were afraid. Judge Howland? Yeah, I have a question. You attacked the city for not issuing the November 2020 order, but doesn't the issuance of this order, the order by basis, you wanted that issued the first place, moot the whole case. Put bluntly, if the November order rescinded the alleged unconstitutional policy, why should injunctive or declaratory release be granted against the first policy? I think that goes to the heart of the briefs on appeal, which is the voluntary cessation doctrine, that if it took a lawsuit to make the city change its position, and remembering the entire history of this, the U.S. Attorney's Office wrote to the city and said, hey, I think you've got an unconstitutional order here. Maybe you should change it. They didn't. They said, we think it's constitutional. PVV, through counsel, sent another similar letter. They continued to persist in maintaining the distinction between parades and demonstrations. It wasn't until a week before their opposition to the motion for preliminary injunction was due that they finally said, okay, we're getting rid of the event moratorium. We're rescinding it. It's rescinded. I don't know how the district court could have concluded that it was rescinded prior to there when on November 23rd the city itself is saying we're rescinding it as of this date of this order. But they decided that that's when they were going to rescind it. That was after it took a lawsuit to have that happen, and that's the heart of the voluntary cessation doctrine. The question under that is, did you change course voluntarily, or was it because of some outside influence, such as a lawsuit? And the fact of the matter here is that when they rescinded the order, COVID cases were seven times higher than they were when they enacted the order. So it wasn't because there was improvement. I'm sorry. Haven't you already won by raising the November order? I think we – yes, we have gotten the release that we requested as a practical matter, but the point of the voluntary cessation doctrine is holding our government officials accountable to the Constitution and not giving them an easy out to say we'll pull back now and you have the release that you want now, but if things spike up again, we might initiate the same order. That's the point of the voluntary cessation doctrine, and that's the point of us persisting in this lawsuit. All right. I just think it's about holding our city officials and our government officials accountable to the Constitution, and if it takes a lawsuit after two letters from the U.S. Attorney's Office and a group that wants to hold an event, if it takes a lawsuit to do that,  the voluntary cessation doctrine steps in and says, no, we're not going to allow you to evade judicial review just by taking away the offending conduct. We're still going to issue a ruling on it, and had the judge said, look, as a matter of – as a practical matter, this really doesn't make much of a difference, but yes, the city was wrong to do this and it shouldn't do it in the future. We wouldn't be here today. The city didn't do – I'm sorry, the district court didn't do that. The district court said that our lawsuit was moot, and that is why we're appealing that determination, the mootness determination. All right. Very well. Good afternoon. I'm Jane Estan, and I represent the city defendants in this case. Good afternoon. So I could go in a lot of different directions, Your Honor. I'm often never quite sure where I particularly take issue with this notion that it took a lawsuit to change the policy, but I guess where I'd like to start with the court's permission is to come back to where Judge Tipp started and where Judge Callen ended, which is that at this – you know, there's basically two levels of mootness that we've alleged now at this point. There's November mootness, November 2020 mootness, and there's mootness at this snapshot in time, to use a phrase from the last argument, and that is that permitting is now open, and the plaintiffs have a permit this year, and what they thought was declaratory and injunctive relief that they'd be permitted to march, they have that relief now. Well, let me ask you this question. You know, that argument would resonate, I think, more powerfully if what we saw from the city was consistent decreases in its kind of COVID-based restrictions, but we haven't seen that from the city. We've seen the city's behavior with COVID-based restrictions respond and go up over time as there's been a surge or there hasn't been a surge, and so one of the nice things about voluntary cessation is we begin to think, okay, all the roads lead to kind of non-existent or non-real threat, and they're never going to come back up. We don't see kind of like a wave curve that's going up and down, up and down, but that's what the city's regulation looks like. Sometimes it drops and there's a COVID spike, then it regulates more, and then it drops and then it goes down, and so there's a pretty good argument that, hey, COVID could spike again, you know, and if COVID spikes again, what do you say to PVV? Do you say, hey, if it spikes, we'll never do that again? I mean, you know, so what we've got is uneven regulation, and I'm not criticizing uneven regulation. You could argue it's responsive to COVID regulation, but when it's uneven, it makes mootness harder to prove because they just have to show a reasonable likelihood of reversion, and we see reversion over time here. So, Judge Fitts, I hear your concern, but I guess a couple things on that, and the first is that I invite the court's attention to the cases that we cited in our 28-J letter, including the Butler County case from another panel of this court. That wasn't a voluntary cessation case. Although, well, the court addressed it. Judge Schwartz did address it in the opinion, and so here's where I'm going with this, and this was also an issue in the Spell case, which we cited in Boston Bit Labs, that the mootness that we're talking about now is the mootness that's occurred because we're now permitting again. We started permitting in May of 2021. That actually has been a consistency all along. It's been a consistency dating back to July of 2020 when the moratorium was announced when we said internally we can't grant permits right now. We can't justify it from a public health perspective. We can't justify it from a cost perspective, and at that time, even at that time, the press conference that the plaintiffs are referring to, you hear Dr. Farley, our health commissioner was asked why February 2021, and his answer was, well, we think that's around the time when we're going to have vaccines, and so that's what Butler County and Boston Bit Labs and the Spell case have recognized is that as the lawyer for the Pennsylvania Department of Health stood up here and told this court, the public health landscape has been fundamentally changed by vaccines and by our knowledge now about how the virus is transmitted, and it's those two things, obviously, that are driving. So let me just tease this out. So what you're saying is, hey, look, you're basically saying based on all that, the likelihood of another surge is not what it would otherwise be. It was uneven over time, but now we're pretty sure that it's going to stay low. But lupus has a constitutional dimension to it, and what's interesting about the constitutional dimension is it doesn't just rest on facts. There is some notion of what are the issues involved, and so let me just ask you this. What's the city's position on the status of its regulation, the constitutionality of its regulation as of October 30, 2020, when PVV filed suit? Do you come here today and say that was unconstitutional? Do you come here today and say that wasn't unconstitutional? Or do you come here today and say we don't want to answer that? Which is it? So I think that goes to standing, and I'm happy to address that, and I was also going to explain that at that point on October 30, 2020, there was no content-based policy. I'm not asking was it content-based. Just because something's not content-based doesn't make it First Amendment permissible. My question is this. As of October 30, 2020, does the city contend that its regulations were First Amendment compliant on that date? Or does it say we admit those were wrong? No, but again, and I see where you're going. No means what? No, it was? No, there was no unconstitutional practice. As of October 30? Yes. But if there's no unconstitutional practice, and PVD says there was an unconstitutional practice, that starts to feel like a case for controversy. If you would say, oh, there's no unconstitutional practice, everything we did then was unconstitutional, maybe you could say we've quit because we acknowledge that it was previously unconstitutional. The court doesn't need to lift its hand. But if you come to court and say, oh, we actually think it was constitutional what we were doing beforehand, and they say, no, it wasn't, and then you have to now show a very, very, very high certainty that you won't revert. And what we know about post-pandemic decisions is nothing is certain. And so you've got a disagreement on constitutionality coupled with nothing is certain. It doesn't feel like it's moot. So let me separate that out. Let me separate my answer out into two boxes before you judge this. The mootness that we're talking about now, like I said, basically two levels of mootness, is that now the city has started permitting again, and they're going to have a parade pursuant to a permit, and we've had other events in October, all kinds of things going on. That was obviously done in response to having vaccines, understanding transmission, with our health department being comfortable that now we can lift. And that's what Judge Schwartz addressed in the opinion in Butler County, and the other judges have said, that it's obvious that the policy change there was not in response to a lawsuit. And, in fact, Judge Schwartz noted that the state hadn't changed course until several months. She addressed the notion that, yes, perhaps the states could have made their orders expire in response to a lawsuit. That's a possibility. But where, again, the public health landscape has changed so fundamentally, that's the reason why the policy has changed. And that applies all the more here. They filed their lawsuit in October 30th. We didn't change our policy and start permitting again until May 2021. But I thought that your response to Judge Phipps would be a little different. He looked at a point in time of the end of October. Correct me if I'm wrong. I thought in September you said something like, bottom line is PVV folks can gather. Now, so that would mean there's no credible threat at that point in time, right? Yes, Judge Green. That's my second thought, but go ahead. Then, you know, you have the supplemental order, which would enhance that argument. Then you have the November order, which I presume, you tell me if I'm wrong, would further enhance the argument that there's no credible threat. So help us, because we're all concerned with November to today, right? Is there anything that the city has done between November and today that would advance the argument that PVV could encounter, sustain a credible threat? Because if not, then at least for the period of time we've talked about, it would seem that cities consist of night. Right. So that's my second box argument, and I'm going to break that up into two boxes, because there's been some confusion. So the first box is speculative to say we're coming back fundamentally. The public health landscape has changed. The reason why we've started permitting again and trying to come back to normal is that things have relatively come back to normal, given vaccines, and given that we now understand a lot more about outdoor transmission of COVID and that it's less of a threat. The second box I want to focus on is that, yes, and that was where I was going to go, is that the question is was there standing, was there standing in the sense that was there a credible threat of enforcement? And as you've alluded to, Judge Schiff, that breaks into two questions. Was there a credible threat of content-based enforcement? Was there a credible threat of enforcement of permitting requirements at all? And I think, you know, that requires a little bit of a two-pronged answer. I mean, I think Mr. Gore keeps referring to the policy as an order, and I think it's important to break out that it's not an order. It's an internal city policy on a website that says that we're not granting permits. We're not granting special event permits. And if anything, that policy was ambiguous more than anything else. It says we're not granting special event permits, but we're still going to allow First Amendment – this doesn't apply to First Amendment-protected activity. So as I argued in our brief, that creates an ambiguity more than anything else. If I have a parade – It's particularly dangerous in the First Amendment space, right? Because ambiguities, threats, ambiguous understandings of enforcement of First Amendment rights can still chill. I mean, one of the areas that the law is least tolerant to ambiguities is First Amendment because it's just chilling. Absolutely, which is why the city's lawyers stepped in to help out and clarify that ambiguity to the plaintiff. Mr. Gore keeps talking about the policies up on the website. The question is, was there a credible threat of enforcement to his client? There's not even an enforcement mechanism in that policy at all. It simply says we're not going to grant permits. And in fact, as we made clear, not just in those two orders, but in the two letters, in the letter from Solicitor Pratt back to Mr. McSwain, and also in now Solicitor Cortez's second letter, we made clear to the plaintiff, we've not granted – during that time, we didn't grant any permits. And we didn't grant any permits up until – we didn't grant a permit for a demonstration. We didn't grant a permit for a parade. And that goes all the way – that includes the large protest that occurred during the civil unrest of that summer. There were no permits granted for any of that. So we're not in a content-based landscape with respect to that summer at all and going forward. And that's what we made clear in those letters. We're not granting permits for anyone, but we're also not enforcing as long as gatherings are generally peaceful. And I think it's worth quoting the September letter that Judge Greenway mentioned. Solicitor Cortez told the plaintiff, with respect to your particular client, the bottom line is that its members can gather on public space. The city has not been forcibly dispersing any peaceful gatherings in an effort to avoid confrontation. So the question is, was there a credible threat to them? And Mr. Bloor says, well, we may have a facial challenge. Well, there are exceptions under the First Amendment for facial challenges for standing, but you still have to have an injury in fact. My understanding is there can be a – if there are relationships with the plaintiff who might be able to – who might have better standing, they have an alleged relationship standing. There might also be standing in a sense of over-breath where you might fall within the plainly legitimate suite that you're allowed to bring the case. But that all comes back to the fact there still has to be an injury in fact. So you're focusing on standing, and I get it. Let me just – this phrase snapshots like the word of the day, right? But it turns out that when in time do we evaluate mootness? Right? We're here on a 1292B interlocutory appeal. You say, hey, look, nothing's happened in this, this, this long. But are we evaluating the district court's decision on mootness on the day the district court made that decision? Or are we supposed to take new evidence, first time on appeal, of mootness after that date? And so it strikes me that it would be great for the city because the longer time period you have without a reversion, the stronger your mootness argument is. But what date do we look at mootness on? We know we evaluate standing on the date the complaint was filed. I don't know what date – I'm inclined to think we look at irreparable injury on the date we decide something. But mootness – I'm kind of thinking we should look at mootness on the day that the district court made the mootness determination. And on that day, the landscape was different. You don't get the benefit of the last 14 months. You might get the benefit of irreparable injury today with the benefit of the last 14 months. I'm not sure you get that on that day. Respectfully, Judge Schiff, I mean, I think I have to disagree. And I hear you that we're talking about evidence that's not in the record, although – And that's a fact. Mr. Gore's not disputing that they have a permit now. And I would also invite the court's attention to the cases we cited where the court sort of took – essentially didn't say it this way, but took judicial notice that the nature of the pandemic has changed and accepted representations of counsel. And, I mean, I hear you, but, I mean, I think the answer would – rather than have you render an advisory opinion, if the mootness that the court is inclined to accept is what occurred – is what recently occurred this summer, I hear you that there's not record evidence in there. And I think your choice would be either you're comfortable with accepting my undisputed representations or it has to come back for a hearing. I mean, it's harder because it's the interlocutory appeal, right? Right. Like, I mean, it strikes me that maybe if this goes back to the district court, nothing prevents you from then showing up there and saying, hi, mootness today. We want the last 16 months, you know, X number of months to go to a mootness argument. But I guess my question is when should we evaluate mootness? And maybe since this is an interlocutory appeal, the best vehicle for doing that, since it's not a final order, not a final decision, the best vehicle for doing that is the court that is fit for, you know, most best equipped to do fact-finding, and that would be the district court instead of us. So given the ready availability of that option, there's no desperation that we do this. Isn't it the better course to say, okay, we're going to look at mootness on that date. If it wasn't moot on that date, it might be moot today, but we're going to remand to the district court to find out if it's moot today, and then you can raise all your mootness arguments there. You can have fact-finding. You can have evidentiary hearing. You can have whatever you want in a way that lets that be really, really amplified instead of us be bounded by concepts of judicial notice, which aren't quite the same rules of evidence. Right. And that's certainly an option. I mean, like I said, I contend that we have the same situation here that we've had in the other cases that I've cited, that there's enough sort of undisputed evidence on the record of how things have changed. Were those final decisions, or were those interlocutory appeals? I know Butler County was a final, because I'm not attached to this. Yeah. But I don't think it matters. I mean, if it comes back, I think we all know what the answer would be. But I also just want to step back, and I'm not at all walking away from our mootness argument from the past, and I'm not at all conceding that voluntary cessation doctrine applies there. No, I'm not saying you are. I'm just saying your mootness argument is stronger today than it was in the past. Absolutely. Right. And it's still strong. Now, one thing Mr. Boyle hasn't talked about is that there's a lag. What's important is there's, you know, we talk about are they going to return to their old ways? Well, what were our old ways? We never enforced it in a content-based way. And, in fact, we never enforced it. There's not evidence that we've enforced the permitting requirements at all against a peaceful group. We've got lots of people gathering. I mean, the rub is chill. Chill is measured by more than enforcement. That's the problem for you there. Well, let me ask you. But I guess, you know, let's come back to the chill, the record with respect to these plaintiffs. I'm not sure how they argue that they're chill. Well, I mean, you'd answer that, what's a chill, credible, no credible threat. Right. And I would come back to solicitor-participant. In this instance, the decisional paradigm, you would agree or disagree with the notion that you deal with standing before mootness? Yes, I agree. I agree, and I think they're both equally strong arguments. If I could just make a couple more points. There was a lot of talk about the 150-person limit, and I just want to make clear that what we told the plaintiffs, and I think it's obvious on the face of these orders, is that that capacity limit changed. The 150-person capacity limit was pegged to what the limit was at that time under our public health orders. We didn't want to endorse groups of more than 150 from gathering. That number went up before they filed their case. And in fact, I think it's Exhibit H. There's an email that now Solicitor Cortez sent to Mr. Bloor saying, I'm attaching the new orders, which had a new capacity limit. I believe it was October 15th, where it had gone up to 7,500 people as a limit. I believe at the time they filed their case, it might have gone back to 2,000, and as Judge Fitts said, it wavered depending upon risk. But it did fluctuate back and forth, and that was, like I said, the enforcement orders were pegged to that. And the only other point that I wanted to make, I did want to invite the Court's attention to the relief sought, because we gave it a little bit of attention in our brief, and the District Court gave it a little bit of attention in the opinion, but I think it's worth pointing out. The relief sought in this case wasn't just, we'd like to gather, the Vietnam veterans would like to gather. The relief sought was, order the city to start permitting again and grant permits. And as the District Court found, as we've argued, that's incredibly broad relief. And the District Court found in a justifiable way that that didn't pass the public interest prong of the test for a preliminary injunction. It basically divested the city of all authority to enforce its public health authority. Judge Howell, do you have anything further, sir? Nothing further. All right, thank you so much. Thank you, Your Honor. Just a few things I want to address on rebuttal. First is the authorities raised in the Rule 20HA letter. I think these authorities actually support our case by showing that the voluntary cessation doctrine acts differently in our case, as opposed to those cases where you had orders that expired on their own terms. The court was very clear in Butler that this voluntary cessation doctrine does not apply, because the orders expired by their own terms and not in response to litigation. Spell was similar. A defendant cannot automatically move a case simply by ending its unlawful contact once sued, but that's not this case because it's expired on its own terms. So those are different cases. And it goes to the burden. If you were in a voluntary cessation situation, the burden is on the defendant, and it's a high burden, a formidable burden, I think the courts describe it as. They have to say that it's absolutely clear that it's not possible that this could occur again. How can you do that in a pandemic? I don't know, but I know that they didn't do it in district court. In these cases, the case decided, it deals with a different burden. It's the capable of repetition without validating review. And then the burden would be on us to show that that's not what we have here. The burden is still on the plaintiffs to show mootness, and they haven't done it. You talked about the relevant date for the mootness determination. I think that has to be in December when the district court entered its order, because that's the point in time where it made its determination that this case was moot, based on the fact that they had rescinded their order. It made the mistake of saying that they rescinded their order before we filed the lawsuit. That's not correct. I think it's clear on the face of the November 23rd order where it says we are rescinding the order, that that's when they rescinded the order. But I think mootness has to be determined on that point. And I agree that if that's the case, the mootness determination is erroneous. It goes back to the district court. So that does not apply to public gatherings. That order, and if you look at the terms of the order, it applies to things like movie theaters, sporting arenas, concert halls. That does not have anything to do with public gatherings on public space like parades. That was to increase the capacity for Eagles games, ostensibly. That's where that 75,000 number comes from. That was what they started permitting for, I don't know if it was preseason at that time or regular season, Eagles games, 75,000 people. But that October 15th order, if you read through and we describe this more fully in our briefs, but that order talks about movie theaters, concert venues, sporting events, not parades or anything of that sort. The one last thing I just want to say is that the letter from the city solicitor's office was saying that you can gather. Well, appreciate it. It begs the question, why not rescind the order saying that you can't gather? And then why does the city double down on that order subsequent to that letter by saying, again, look, if you want to have events and you have under 150 people, that's fine, but over 150 people, you need permits. We'll try to avoid forcibly shutting you down, but we're not making any promises. And if you violate this order, regardless of whether or not we shut you down, you're exposed to civil penalties and fines and all other sorts of punishments. That directly contradicts the city solicitor's invitation that we can publicly gather when a few days later the city issues an order saying, no, that's not the case. And even if the city solicitor's letter had the force of law, which it doesn't, it would be hard for us to say, look, we know we knowingly violated the city's executive order, but look, before the city issued that order, we have a letter from the city solicitor's office that said it was okay. I think the city would understandably say, well, that's great for you at that point in time and maybe you can make an argument, but the fact remains, you were aware, because we had an executive order on the books, that said you cannot do this. If you have over 150 people, you need a permit, you didn't get a permit, you're out of luck. Mr. Collins, do you have anything further, sir? Nothing further. I guess my only question is, why do we need to address banning of movements at all? We're here on an interlocutory appeal. There's four distinct prongs. One of them is likelihood of success on the merits. That's what standing and mootness go to. The second one is irreparable injury. Everyone knows there's not an irreparable injury right now, and you need to show something in the irreparable injury space. Why don't we just say we don't need to address the likelihood of success on the merits, because you come with nothing right now by way of irreparable injury at this point in time. And then we say, hey, look, we'll send it back to the district court to do whatever it wants when the time comes, but since we're here on just an isolated issue, and one of the reasons for affirming the district court is purely irreparable injury, why doesn't that just end this case, and then we say, hey, look, the district court's better equipped to sort out at least mootness on the merits of your claims there without the PI issue. Why isn't this just it should be affirmed on irreparable injury grounds without even getting to likelihood of success on the merits and the jurisdictional questions? Because there wasn't an irreparable injury determination by the court. They didn't engage in that discussion or that analysis because they had made a finding of mootness. And if this case got sent back to the district court, the district court would again say, well, I've already found that this was moot. It's still moot. Nothing has changed to change that mootness. What we're saying to this court on appeal is that that mootness determination was incorrect. It cannot be moot because of the voluntary cessation doctrine. We were entitled to our day in court, and if they are, you know, the fact that they convinced the district court that this case was moot and we had to go through an appellate procedure to get this case back on track, that does not allow them a loophole to get away from their unconstitutional. I'm going to interrupt you because you're missing a point, I think. Okay. The judge is suggesting to you let's put mootness aside. So everything you've said about voluntary cessation, let's put aside. You win. What do you have to say about irreparable injury? We've asked you the question, so this is somewhat rhetorical. The fact that you can't suggest irreparable injury means that with regard to the preliminary injunction, we're at the end of our road, and the judge is asking you, isn't that so? So I think the time to respond on irreparable injury, if you have anything to say, is now. I think if that were the court's determination, at the district court we'd be able to make other arguments that we didn't have to make yet but could, and one of those arguments would be the capable repetition but abating review, which if we have to go to the appeals court and go through a whole appellate process just to overturn a mootness determination, to have a court actually reach the merits of the order that we're challenging, I think I would like our argument that they do not get the benefit of being able to say, well, that was eight months ago because we had to go through the whole appellate process, so that's gone now. We don't need to concern ourselves with that. I think it all goes back to if what they're saying is that we could have gathered as of October 30th, why was that order still on the city's website? Why didn't they issue it? Why didn't Mayor Kenney have another press conference saying, hey, look, that order that we made in July, that was a mistake. We don't want to chill any speech. We realize, you know, that that was incorrect. Have at it. You can have whatever parades or demonstrations or festivals or whatever you want. We're not going to enforce that order because it's explicitly rescinded. They didn't do that, and I think they specifically did it for a reason. Okay. Thank you so much. We appreciate it. Thank you.